**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

KEONDRA MONTREL CHESTANG,                                                                         PLAINTIFF
ADC #134005

v.                                            NO. 2:09CV00068 JLH-JTK

MARTHA WIGGINS                                                                                         DEFENDANT

**OPINION AND ORDER**

Keondra Montrel Chestang, a male inmate of the Arkansas Department of Correction, alleges that Martha Wiggins, a female officer of the Arkansas Department of Correction, violated his Fourth Amendment rights by conducting a visual strip search on June 16, 2008, while Chestang was incarcerated in the administrative segregation unit of the East Arkansas Regional Unit. Wiggins moved for summary judgment, and the magistrate judge to whom this case was referred recommended that the motion be granted. For the reasons that will be explained, the Court declines to accept the magistrate judge's recommendation and denies the motion for summary judgment.

**I.**

Chestang was in the East Arkansas Regional Unit, Max 6, which is a barracks that houses administrative segregation inmates, from May 14, 2008, through September 16, 2008. Administrative segregation inmates generally include those inmates who have committed assaults on officers and fellow inmates, those who have harbored prison shanks or contraband, and those who are on protective custody. Administrative segregation inmates are permitted one hour of recreation call each day. Before going to yard call, they must be searched in order to confirm that they are not harboring contraband or weapons on their bodies.

According to Chestang, on June 16, 2008, Wiggins came to his cell, which had a solid door. She looked through the window in the door and asked him if he wanted to go to yard call, and he said

that he did.  He testified in deposition that she required him to strip completely naked and then squat and cough, and lift his genitals, while she watched.  Chestang says that the strip search took place in his cell and took approximately sixty seconds.  Afterwards, Wiggins gave his clothing back, instructed him to dress, handcuffed him, and escorted him to yard call.

On June 20, 2008, Chestang submitted a grievance pursuant to the ADC grievance policies.  He stated in that grievance:

> On the date of 6/16/08, I alledge that I was unproperly searched therefore causing humiliation & embarrassment (on the above date)[.] Before exiting my cell for yard call, I was directed by Sgt. Wiggins to drop my boxers, squat & cough.  This complaint isn't brought against this particular officer[1] due to I understand she was directed & trained through higher administration to conduct searches in the above mentioned order thereby as including this complaint is brought against: Chief of Security Major M. Williams, Deputy Warden S. Outlaw and Warden G. Harmon.  This is an ongoing issue, more than one officer is conducting searches of this nature . . . .

Warden Harmon denied the grievance, stating that the grievance was conducted according to Policy 9.08.0.  Chestang appealed, contending that he was "strip searched in an unproper manner by Sgt. Wiggins."  The appeal was then reviewed by Ray Hobbs, who was then the assistant director of the ADC.  After reiterating the necessity for strip searches of inmates in administrative segregation, Hobbs said:

> However, it is also noted in AD[2] 08-14, that strip searches shall be conducted in a professional manner by staff of the same gender as the inmate except in cases of emergency (i.e., escape, riot, etc.).  Strip searches of inmates do not require reasonable suspicion that the individual is concealing contraband.

---

[1] Wiggins has not moved for summary judgment based on Chestang's failure to name her in his grievance, so the Court will not address that issue.

[2] AD is an abbreviation of administrative directive.

> Based . . . upon my review, I did not find that there was an emergency taking place in this instance, therefore, I find that AD 08-14 was not adhered to when Sgt. Wiggins (female) asked you to drop your boxers, squat & cough to be strip search[ed] to be taken for yard call. I therefore, find merit to this Grievance Appeal and I will advise Warden Harmon via this Grievance Appeal decision to follow up with Sgt. Wiggins on the importan[ce] of following AD 08-14.

In this action, Chestang originally named as defendants Sergeant Wiggins, an assistant warden named Steve Outlaw, Warden Greg Harmon, Ray Hobbs, and Larry Norris, who was then the Director of the ADC. The complaint against Norris, Hobbs, Harmon, and Outlaw was dismissed on defendants' motion for judgment on the pleadings. Wiggins's motion for judgment on the pleadings was denied. Wiggins thereafter moved for summary judgment. As noted above, the magistrate judge recommended that Wiggins's motion be granted.

In support of her motion for summary judgment, Wiggins submitted her own declaration in which she says that she has been trained not to participate in visual searches of male inmates outside the presence of male officers, and she cannot recall any occasion in which she, alone, conducted a visual search of a male inmate. She says that during her tenure at the ADC she has been present while male correctional officers conducted visual searches of male inmates but believes that if she had conducted a visual search of a male inmate she would remember doing so because it is her habit and practice not to participate in searches of male inmates unless a male correctional officer is present.

Warden Harmon has submitted an affidavit in which he says that Chestang received a disciplinary citation in October 2007 for attacking an officer and another on January 15, 2008, for possessing a shank in his cell, so there was an institutional need for Chestang to be searched before exiting his cell in the company of an officer. He says that it is important that women be permitted to participate fully in correctional efforts in order for female correctional officers to advance in rank

in the same manner as male officers and that while he was the Warden at the East Arkansas Regional Unit Max, women comprised roughly one-half of the unit's workforce. He says that restricting female officers from being in the vicinity of searches of inmates before yard call would have a negative impact on guards, other inmates, and prison resources. Harmon does not, however, say in his affidavit that requiring visual strip searches to be performed by officers of the same sex would adversely affect prison operations. Indeed, it appears from the record that ADC policy requires that visual strip searches be conducted by an officer of the same sex as the inmate, absent emergency circumstances, even though officers of the opposite sex may be in the vicinity.[3]

## II.

**A.    THE STANDARD GOVERNING THE CONSTITUTIONALITY OF THE ALLEGED SEARCH**

The Fourth Amendment guarantees a person's right to be free from unreasonable searches. Whether a search is reasonable under the Fourth Amendment requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979). The required factors for courts to consider include: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." *Id.*

Wiggins argues that the alleged strip search was constitutional using the *Bell* factors and, in the alternative, the factors set forth in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d

---

[3] As noted above, Chestang submitted a grievance regarding this incident. His grievance was denied at the unit level but upheld by the assistant director of the ADC on the basis that Administrative Directive 08-14 requires strip searches to be conducted by staff of the same sex as the inmate except in cases of emergency, and no emergency required Wiggins to conduct the strip search on June 16, 2008.

64 (1987). Although it is true that this and other courts have applied the *Turner* test in seizure cases, *see Williams v. Bradley*, 5:05CV10 BD, 2008 WL 2954247 (E.D. Ark. Jul. 29, 2008), *Turner* seems less applicable than *Bell*. *Turner* is used to assess the constitutionality of prison regulations that limit an inmate's ability to exercise his constitutional rights: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S. Ct. at 2261. When applying *Turner,* the court considers: (1) whether there is a valid, rational connection between the prison regulation or practice and a legitimate governmental interest; (2) whether the regulation or practice allows inmates an alternative means of exercising the subject constitutional right; (3) the impact of accommodating the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice. *Id.* at 89-91, 107 S. Ct. at 2261-62.

Although *Turner* follows and in some ways may supersede *Bell*, it does not seem to apply here because a prison regulation is not in question; in fact, ADC regulations prohibited strip searches by officers of the opposite sex of the inmate. Moreover, a number of courts have continued to analyze the reasonableness of a strip search under *Bell*. *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1142-43 (9th Cir. 2011) (applying the *Bell* factors); *see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 306 n.5 (3d Cir. 2010) ("While it is arguable that some Fourth Amendment rights are 'inconsistent with proper incarceration' and therefore covered by *Turner*, absent an express statement from the Supreme Court that *Turner* supplanted *Bell*, we find its framework for the analysis of detainee constitutional claims inapplicable here.") (internal citations omitted); *Powell v. Barrett*, 541 F.3d 1298, 1302 (11th Cir. 2008) (addressing the defendants' contention that the *Turner* test applied in a strip search case and finding that, because the defendants

would win under *Bell*, it "need not decide if that approach has been superseded by the more deferential *Turner* one").

B.  **PRECEDENTS FROM THIS COURT AND THE EIGHTH CIRCUIT REGARDING STRIP SEARCHES BY MEMBERS OF THE OPPOSITE SEX**

In *McIllwain v. Weaver*, 686 F. Supp. 2d 894 (E.D. Ark. 2010), this Court granted a male officer's motion for summary judgment after a female detainee alleged that she was subjected to a visual strip search in front of the officer. In granting the motion, the Court found special circumstances necessitated his presence—specifically, that the plaintiff was resisting the female officer's search efforts. The Court stated, "[t]he strip search of a detainee performed by a member of the opposite sex, in the absence of a special circumstance, violates a detainees [*sic*] limited right to privacy. The special circumstance might be chaos in a cell block or no other same-sex employees available when the need is urgent, but there should be some justification of the presence or participation of an opposite-sex officer." *Id*. at 904.

In *Williams v. Bradley*, 2008 WL 2954247, this Court addressed the issue of routine, daily strip searches of male inmates by male guards with female guards in the vicinity. This Court, applying the *Turner* analysis, ultimately determined that summary judgment was warranted because the plaintiff's rights had not been violated:

> Federal courts apply a rational relationship test for assessing the constitutionality of prison regulations and practices. *Turner v. Safley,* 482 U.S. 78, 84-85, 107 S. Ct. 2254, 2259-60 (1987). The Plaintiff in this case admits to the validity of the strip search policy, but complains that the policy was not followed (# 205, ¶ 112-35). He alleges that female guards routinely remain in the immediate area where male inmates are being strip searched as they are escorted to and from the yard. For purposes of deciding this motion, the Court will assume that this allegation is true.
>
> Applying *Turner,* the Court must consider: (1) whether there is a valid, rational connection between the prison regulation or practice and a legitimate

governmental interest; (2) whether the regulation or practice allows inmates an alternative means of exercising the subject constitutional right; (3) the impact of accommodating the asserted right on guards, other inmates, and the allocation of resources generally; and (4) the absence of ready alternatives to the regulation or practice. *Id.* at 89-91, 107 S. Ct. at 2261-63.

The extent of a prisoner's right to privacy is inversely proportional to the threat he poses to guards and other inmates. There is an apparent and valid security reason to strip search inmates, such as the Plaintiff here, who are in Administrative Segregation in the Maximum Security Unit of the prison. As noted, this Plaintiff not only brutally killed three of his own family members, but also has been involved in the stabbing and killing of two inmates during his incarceration. The need to search this inmate requires no further explanation. Indeed, Plaintiff does not contest the fact that Defendants have a rational basis to strip search inmates who pose such a risk. There is no serious issue as to the ADC's rationale for assigning two guards to escort this category of inmates to and from the yard.

This does not end the inquiry. The question in this case is whether female guards should be permitted in the immediate vicinity of strip searches of male inmates. In other words, does the ADC have a rational basis for assigning women guards to escort male prisoners? There is a rational basis for such a policy. As the Court of Appeals noted in *Timm,* 917 F.2d at 1102, a same-sex rule for prison guards would significantly affect the cost of staffing, resources, and equal employment opportunities for women guards.

There is no allegation that female guards actually conduct the strip searches. In fact, the record establishes that the ADC policy is that only male guards conduct strip searches of male inmates, absent exigent circumstances. This is an accommodation of male prisoners' limited right of privacy. In considering the impact of accommodating the Plaintiff's privacy rights on guards and the allocation of resources generally, the balance tilts in favor of Defendants. As noted, it would present a significant burden on the ADC, in terms of both costs and allocation of guards, if a same-sex guards were mandated for prisoners in Administrative Segregation. In addition, such a rule would burden females guards as well as applicants. They would be inherently less desirable employees, because they would not be allowed to perform the full range of duties expected of prison guards.

The absence of ready alternatives militates in Defendants' favor, as well. Strip searches of the most dangerous inmates is necessary for the safety of inmates and guards alike. Likewise, the decision to assign two guards to escort this category of inmate is a reasonable security measure. Any rule requiring that female guards not be present during these routine, daily searches would impose a burden on the prison and female guards that the law, quite simply, does not require.

> None of this discussion, however, minimizes the settled rule that searches, and particularly strip searches and body-cavity searches, must be conducted in the least offensive manner possible. Barring exigent circumstances, strip searches should be conducted by officers of the same sex as the individual searched. *Richmond v. City of Brooklyn Center,* 490 F.3d 1002, 1008 (8th Cir.2007) (citing *Roberts v. Rhode Island,* 239 F.3d 107, 113 (1st Cir.2001)). Strip searches also must be performed in a fashion that minimizes the inherently degrading and humiliating nature of such searches. *Id.* (citing *Seltzer-Bey v. Delo,* 66 F.3d 961, 963-63 (8th Cir.1995). In *Hill v. McKinley,* 311 F.3d 899 (8th Cir.2002), the Eighth Circuit found a constitutional violation when a stripped detainee was subjected to prolonged exposure to officers of the opposite sex. *Hill* is sometimes cited for the proposition that cross-gender strip searches do not violate the constitution. This is a misreading of the holding in *Hill.* In *Hill,* the Court of Appeals explicitly found a constitutional violation, but granted qualified immunity because, until that case, the detainee's right was not "clearly established." *Hill,* 311 F.3d at 904.
>
> While *Hill* involved a detainee, not an inmate, this holding, together with numerous other cases, place Defendants on notice that any intentionally degrading conduct during a strip search, including derisive speech intended to humiliate inmates, violates a prisoner's limited right of privacy. As noted above, the female guard identified in discovery as someone who allegedly made degrading remarks during strip searches of male inmates is not a party to this lawsuit. Had she been named, the outcome of the current motion might well have been different.
>
> Under the undisputed facts alleged in this lawsuit and the law in this Circuit, Defendants have not violated Plaintiff's constitutional right to privacy. There is no reason, therefore, to discuss the second prong of the test for qualified immunity, *i.e.,* whether the law was clearly established.

*Id.* at *10-13 (footnotes omitted).

In *Kendrick v. Faust*, 682 F. Supp. 2d 932, 942-43 (E.D. Ark. 2010), this Court determined that a female inmate's constitutional rights were not violated simply because male officers could see her nude in the shower. The facts in *Kendrick* established that the plaintiff was disruptive and had to be removed from her cell. Consequently, *Kendrick* relied upon *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), an Eighth Circuit case involving the strip search of an intoxicated and unruly detainee.

8

In *Hill*, the plaintiff alleged that her Fourth Amendment rights were violated when she was required to disrobe in the presence of a male guard:

> With respect to Hill's first claim, the parties dispute which guard required Hill to disrobe when she was placed in the padded cell. Hill testified that it was Miller, and Holmes testified that she had required Hill to undress. The jury was entitled to credit Hill's testimony that it was a male guard who required her to disrobe. Even if it was a male guard, however, we cannot say in light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety. *Timm v. Gunter,* 917 F.2d 1093, 1102 (8th Cir.1990) (opposite sex surveillance performed on the same basis as same-sex surveillance not unreasonable where justified by safety and equal employment concerns); *Franklin v. Lockhart,* 883 F.2d 654, 656-57 (8th Cir.1989) (visual body cavity searches conducted in view of other prisoners upheld absent substantial evidence that it was an exaggerated response to security concerns); *see also Lee v. Downs,* 641 F.2d 1117, 1120-21 (4th Cir.1981) (upholding search of inmate's vagina by a female nurse in the presence of two male guards).

*Id.* at 903 (citing similar cases involving special circumstances). The court did find, however, that Hill's rights were violated when she was "secured to the restrainer board naked and spread-eagled in the presence of male officers . . . for three and a half hours." *Id.* According to the court, "Hill's Fourth Amendment rights were violated when the defendants allowed her to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed." *Id.* at 904.

In *Richmond v. City of Brooklyn Center*, 490 F.3d 1002 (8th Cir. 2007), the Eighth Circuit summarily stated that in 2001 the law was clear "that strip searches should be conducted by officials of the same sex as the individual to be searched." *Id.* at 1008. *Richmond* did not involve a strip search by an officer of the opposite sex, and the strip search that was at issue was not a visual strip search—it involved physical contact with the inmate. Nevertheless, *in dicta* the Eighth Circuit said that the law was clear in 2001 that strip searches should be conducted by officers of the same sex as

9

the person searched. Moreover, as noted above, the decisions of this Court also have said that strip searches must be conducted by officers of the same sex as the inmate absent special circumstances.

### C.    PRECEDENT FROM OTHER CIRCUITS

In *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994), the Seventh Circuit held that a male inmate who complained of visual strip searches by female guards stated a claim upon which relief could be granted. Basing its holding on the general "right of privacy" guaranteed by the constitution, the court stated that "where it *is* reasonable—taking account of a state's interests in prison security and in providing equal employment opportunity for female guards—to respect an inmate's constitutional privacy interests, doing so is not just a palliative to be doled out at the state's indulgence. It is a constitutional mandate." *Id.* at 188. The Seventh Circuit attempted to clarify its holding in *Canedy* two years later in *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995), a case in which an inmate objected to monitoring of naked inmates by officers of the opposite sex. The Court held that the fourth amendment does not protect privacy interests within prisons and that monitoring of naked inmates by guards of the opposite sex was not unconstitutional. *Id.* at 150-51.

In *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987), the Sixth Circuit recognized a limited right of privacy that protects prisoners "from being forced unnecessarily to expose their bodies to guards of the opposite sex." *Id.* at 1227. On remand, the court applied *Turner v. Safley* and determined that occasional exposure of an inmate's body to guards of the opposite sex was justified by the interests of female guards in equal employment opportunities.

The Fourth Circuit has indicated that involuntary exposure in the presence of people of the opposite sex must be "reasonably necessary." "When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons." *Lee v. Downs*, 641 F.2d 1117,

1119-20 (4th Cir. 1981) (finding that "males subject to frisk searches by female guards during which the genitals are touched and felt through clothing [are] entitled to injunctive relief").

In 1998 the Ninth Circuit held that "a visual strip search of male prisoners by female guards, without more, does not violate a privacy right." *Fain v. Gomez*, No. 97-16226, 1998 WL 255311, at *1 (9th Cir. May 20, 1998); *see also Dodds v. Lascano*, No. 1:09CV656, 2009 WL 3614786, at *3 (E.D. Cal. Oct. 27, 2009) ("The fact that the [strip] search was conducted in the view of a female staff member and other inmates, by itself, does not render the search unconstitutional."); *Guillory v. Snohomish Cty. Jail*, No. C06-747MJP, 2007 WL 2069856, at *5 (W.D. Wash. Jul. 16, 2007) ("The Ninth Circuit has already rejected the argument that a search of a male prisoner by a female guard is *per se* unreasonable search and seizure."); *Kuntz v. Wilson*, No. 94-35221, 1994 WL 417424, at *1-2 (9th Cir. Aug. 10, 1994) ("Here, Kuntz has alleged only a single isolated instance in which a female correctional employee was able to observe him naked. Such an incident constitutes the type of infrequent and casual observation which does not violate an inmate's constitutional rights."). However, earlier this year, the Ninth Circuit issued an opinion in which it found that a strip search of a male inmate by a female cadet was unreasonable as a matter of law. *Byrd*, 629 F.3d at 1142. The court reviewed the cases from the various circuits and concluded, "This litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches." *Id*. at 1146.

In *Hayes v. Marriott*, 70 F.3d 1144 (10th Cir. 1995), a case involving a visual body cavity search in the presence of female corrections officers and several nonessential personnel, the Tenth Circuit reversed summary judgment in favor of prison officials, holding that the search could have

violated the plaintiff's Fourth Amendment rights and that a single or minimal viewing of a prisoner by prison officials of the opposite sex could, under certain conditions, constitute a Fourth Amendment violation. The Court said "[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." *Id*. at 1146 (quoting 3 *Privacy Law and Practice* ¶ 15.02[1] (George B. Trubow ed. 1991)).

The conclusion that emerges from these cases is that absent exigent circumstances a strip search must be conducted by a person of the same sex as the person to be searched. According to the Eighth Circuit, that rule was clearly established by 2001.

### III.

There is a genuine issue of material fact as to whether a strip search occurred in this instance. Chestang has testified under oath that he was ordered to undergo a strip search by Wiggins, whereas Wiggins has submitted a declaration under oath stating that she does not believe that she has conducted such a strip search. Moreover, if a strip search occurred, Wiggins has not met her burden of showing there is no genuine issue of material fact as to whether any emergency or exigent circumstances required the strip search to be conducted by an officer of the opposite sex. Although Harmon states in his affidavit that restricting female officers from being in the vicinity of strip searches of male inmates in administrative segregation prior to yard call would have a negative impact on prison operations, he does not say that it would have an adverse impact on prison operations for male officers to conduct routine visual strip searches of male inmates in administrative segregation before the daily yard call, even if female officers may also be in the vicinity. Indeed, in reversing Harmon's decision to deny Chestang's grievance, Hobbs stated that ADC policy provides

that, absent an emergency, strip searches must be conducted by officers of the same sex as the inmate being searched. If so, one would expect that an all-male unit ordinarily would be staffed so that routine strip searches, such as the alleged strip search here, could be conducted by male officers. Wiggins presents no evidence that special circumstances required that she conduct a strip search of Chestang on June 16, 2008. Indeed, she denies that she conducted such a strip search.

## CONCLUSION

For the reasons stated, the motion for summary judgment is denied. Document #88. The Court declines to adopt the proposed findings and recommended disposition. Document #96.

IT IS SO ORDERED this 23rd day of February, 2011.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE